The next case on the docket is Certain Underwriters at Lloyds of London versus Anchor Insurance Holdings, an Anchor property and casualty insurance company. Patrick Michael Chidneys is here for the appellant. Anchor Sina Bahadurin is here for Certain Underwriters at Lloyds. And when you're ready, Mr. Chidneys, you may begin your argument. Good morning. May it please the Court? Patrick Chidneys. I'm Freda Lindroth on behalf of the appellants. Anchor Insurance Holdings, an Anchor property and casualty insurance company. I'll refer to them together as Anchor. The appeal for the court involves the rescission of a director's and officer's liability policy issued by Lloyds Syndicate. The district court at Docket Entry 130 held that Anchor misrepresented answers and its insurance application to Lloyds, namely that Anchor made potential claims by disqualified investors and two completely distinct entities, THD and THD2. The investors, these investors were led by someone named Mr. Esrick. They did not own any Anchor stock. They did not have any contractual relationship with Anchor. Instead, these sophisticated investors structured their investment this way on purpose. Mr. Esrick, who was the lead investor, testified that this was the best vehicle to accomplish what they were trying to accomplish. The next question of the opposition, well, what were you trying to accomplish? These were sophisticated investors that structured their deal this way. Now, after investing, the investors began communicating with the managers of THD. That's Mr. Bowman, Mr. Monk, and Mr. Hooker. They also had affiliations with Anchor at different times. The e-mails that began in January of 2018 and lead to them hiring a lawyer and filing a lawsuit, they all request revaluing their shares in THD and eventually rescission from THD. They meet, as I said, with a retaining counsel who sends a demand letter on April 6, 2018, and then they rescind THD and THD2, not Anchor, in May of 2018. Looking at these records, the district court entered a summary judgment and concluded that no reasonable juror could find that the potential claims against THD were not also potential claims against Anchor. The district court reached this conclusion, quote, due to the corporate structures of the entities and the extensive personal involvement of Bowman, Monk, and Hooker, both the THD entities and Anchor, close quote. So on April 6, 2018, there was a formal demand letter by the investors for rescission and sent to, as you stated, Bowman, Monk, and Hooker. That's document 110-32 at page 29, and the record reflects that it was sent six months prior to the insurance application. That is correct, Your Honor. Okay. So that seems to support actual knowledge. Your Honor, the first step here, I'll respond to the question, but I want to frame the legal inquiry. The question for knowledge, again, it's a subjective test, but it is governed by objective criteria. So you can't question it, but you can make a case, as the court has said. That letter, if you look closely, there is a three-line memo line there. The three-line is THD and THD2, and then a forward slash, as in, you know, a B in a lawsuit, and then the investors. The rest of that letter reads, we're making a formal rescission demand. But the most important piece of additional evidence, which the Appellee's Brief never mentions, is that the author of that letter also files the investor's lawsuit. He's deposed in this lawsuit, and he's asked, did you ever accuse Anchor of an act or omission that could give rise to a claim before you can make a complaint, which is after the insurance policy was applied for in Bowman. So when you look at that evidence together, the author of that letter did not construe it to be an accusation against Anchor. Well, they're seeking rescission of their investments, right? From THD and THD2. That's the point, is that these sophisticated investors chose not to own Anchor, who they were accusing of misconduct with THD intermediate investment vehicles. And this is called, shortly after that demand letter, one month later, there's a lawsuit filed. And so all three of these directors that I just mentioned, they're directors of Anchor, and they're directors of, what is it, THD? The timing is sort of important. So they were all managers of THD at the relevant times. Only one of them had a relationship with Mr. Bowman, had a relationship with Anchor at the time of the investment. So Mr. Monk and Mr. Hooker became directors in December 2017 after the investments occurred. But for sake of argument, there is a relationship through Mr. Bowman. And that's important because if you start looking at the communications, the very first email they sent in January 2018 isn't to Mr. Bowman. It's to the directed capital individuals talking about their investment in THD. No one is accusing Anchor of anything. These investors, another... The investors are seeking rescission of their investment, right? Okay. THD. Well, they were looking for rescission. They were also looking for the issuance of another Series C from THD.  We also have on March the 14th, Daniel Bowman, the chair of Anchor, sent Munch and Hooker an email acknowledging that the investors wanted their money back. Is that right? That's right, Ron. If you look further to that email, same day, there's three emails in that exhibit. If you look to the very first one, there's an internal email among the managers. And it says they're looking for the deepest pockets. It's Tibbetts, DCR, Hooker, not Anchor. There's no mention there that they're coming after Anchor. They're looking at Anchor. And there was a heated meeting involving Bowman and others and the investors regarding rescission. And that's in the record, too. So the way I'm understanding this is we have questions 9 and 10. Question 9, it seems to me, is asking for objective and subjective knowledge. Was there, as a matter of fact, was there a claim against Anchor? And let me just back up a step. You don't contest that there was a rescission claim against someone, right? There was a rescission claim. There's no question there was a rescission claim against THD entities, right? The question is whether there was a rescission claim also against Anchor. And if there was, whether you all had reason to know about it, right? Those are the questions 9 and 10. Is that fair to say? Okay. So I will tell you what my kind of sticking point here is. It seems to me that it's not entirely clear against whom the investors intended to seek or were demanding rescission. Because they're saying they're demanding rescission. But they also put Anchor in the address for one of the directors of THD. We know they invested in THD specifically, not in Anchor. That THD will then make the investments into Anchor. And so it's not entirely clear to me whether, in fact, there was a claim against Anchor at the time. But it seems to me like Anchor had reason to know that there could be a claim at the time, right? And that would go to question 10. Why is that not the case? The theory of the rescission from Anchor, Mr. Baumann was deposed and he explained that other members of THD would not have sought to rescind their investment in Anchor because they're, quote, long-term investors. In other words, there could be rescission in THD. That's why these investors went after THD. But THD was not going to then rescind the stock in Anchor. That is another circumstantial fact showing that their perception, question 10, was reasonable. But the question is whether they knew that there could have been, right? And this goes to the point. This was summary judgment. Your Honor, I agree with you. There are facts here that needed to be evaluated. Our primary argument on the appeal is that instead of conducting that analysis, instead of going through that, what the district court essentially did was short-circuit the inquiry and say, well, because of corporate structures, Anchor equals THD. And as this Court has said and as the Court is surely aware in Florida, there's a very high bar. I don't think the district court said because of corporate structures, Anchor equals THD. I think what it said was it noted that THD was investing in Anchor and that the officers of the two directors, I guess, there was a crossover on that. And so it was just sort of noting those things. I don't think it pierced the corporate veil. I don't understand the district court's decision to have done that. But rather to have used the fact that these directors were, there was a strong crossover in both THD and Anchor, and they obviously knew what was going on in both corporations. And the fact that there were communications from the investors in THD that also referenced Anchor to say that they were investing in Anchor. They knew or should have known that there was a claim, that there was a possible claim against Anchor at the time. Yes. Your Honor, to respond to both of those points, the docket 130, pages 5 to 6. Although Anchor attempts to argue that any potential claims were against the THD entities and not Anchor, no reasonable jury could find this to be true due to the corporate structures of the entities and the extensive personal involvement of Bauman, Monk, and Hooker. That is an unpleaded and unlitigated attempt to pierce the veil. The corporate structures have nothing to do with this. There's no argument that a claim against THD equals Anchor because of a corporate form. But to your point about the extent to which the Anchor entities were aware of potential claims against it, that's where the analysis, which appears in Casa Messina from this court's decision in Sands, you need to look at all of the evidence. And because it's a subjective analysis, that needs to go to the fact finder and not be resolved at summary judgment. We're arguing right now about facts that have conflicting inferences and information that the jury, a fact finder, whatever the fact finder is, needs to evaluate to determine whether there is subjective knowledge. So you're saying that there is a genuine issue of material fact here as to whether Anchor under Question 10 should have been aware that it could have been sued given the email chain and all of, I think, the very bad facts for your clients that Judges Wilson and Rosenbaum just laid out. Also coupling that with the fact that you yourself have referred to your clients as sophisticated investors? Your Honor, I was referring to the investors that eventually sued THD in May of 2018 as the sophisticated investors. Those are the individuals who brought the claim. Those are the individuals who sent the emails and the letters to which you're referring. Okay, then I apologize. I'm going to call your clients sophisticated entities that should have at least been aware. It appears from the record, from the facts, that this seemed pretty straightforward. And I'm not clear that there was even a need to send this to a jury. Yes, Your Honor, and the arguments we've made throughout the briefing is that a close review of those emails, they were not sent to a single Anchor account. And this is dispensed with in the Apley's brief. There's not a single Anchor domain. None of these are sent to different domains of other investment entities, showing the distinction between these companies. And the other evidence submitted to summary judgment, for example, that Mr. Baumann submitted an affidavit saying, if I thought there was a claim, it's a simple project for me to turn it over to General Counsel. None of them did this, and this was all confirmed at the time of the application because they had been litigating a case against the THD entities alone. So the investors only sued THD up until December. But as sophisticated investors, I mean, wouldn't it have been sort of unreasonable for THD and its directors and Anchor to believe that these sophisticated investors who had invested, what, $15 million or something, would just walk away and not seek recompense or rescission from Anchor if they couldn't get satisfaction from THD? That's exactly the point. That's the inquiry that a fact finder has to make because there were certainly facts indicating that they were not going to pursue Anchor. Frankly, I would state that the emails and letters were not sent to Anchor. The lawsuit was not filed against Anchor. All those facts confirm that at the time of the application, the subjective beliefs that each of these individuals said they had in their affidavit is confirmed by outstanding circumstantial evidence. At the time they submit those affidavits, at the time of the application, and I apologize, a minute of my rebuttal. Well, we're going to go over. Go ahead. At the time of the applications, they had been defending, THD alone had been defending lawsuits by these same investors. There's no hint that they were now going to pursue Anchor. I would submit that if I'm defending a lawsuit for five months and it's against entities here based on this conduct and no other entities are involved, it's somewhat reasonable for me to think that's who they're going after. That's consistent with the letters, a close review of the letters and most importantly, their counsel's sworn testimony that they made no accusation against Anchor until they met. And so you're saying it wouldn't have also been reasonable for Anchor to believe that the entity, the investors could have actually come after them eventually as well? That's one question. And then my second one is just about the record and timing. So it seems that the policy was issued in November 2018 and then Anchor was added as a party to the amended complaint in December 2018. What information was then provided to the insurer about that change in the status of the lawsuit? So we're working backward. My understanding is the policy was applied for in October, bound in November, and then the lawsuit, the complaint was actually accepted in, I think, February of 2019. And then there was a claim made. So they were informed after there was a claim. But as to the first question, what was reasonable about whether to anticipate a claim, from our review of this evidence, unless you pierce the veil, unless you say that THD equals Anchor, all of these demands leading to the investor's demand letter are to THD or THD2, either to rescind the investment or to revalue their cost basis. Nothing to Anchor. Well, we have a few more questions now because we're asking a lot of questions. And I'm trying to figure out what your authority is to support application of a subjective rather than an actual knowledge test. Because when we look at the case law, it appears to say that the test is truth or falsity, right? Isn't that what we said in Hauser v. Life General? Yes, sir. It's a somewhat extended answer. But the quickest response is actually the supplemental authority that Lloyd submitted, the RLI insurance case. It actually has a truth or falsity at the end of the application, but a subjective knowledge question and says that, well, this is partially subjective. And I can explain further under the precedent. This court's decision in Sands is really the origin of this truth or falsity analysis. At the time, the Florida Supreme Court in Carroll had an application that had knowledge of belief at the end and an objective question. The court said, you've got to read that together. So the Florida Supreme Court then, in green, adopts Sands. And you move forward into cases like Casa Messina. I would submit that if the policy at the end says the foregoing is incorrect, but question 10 says, does somebody know something, that is a partially subjective analysis. I don't believe that you can analyze subjective belief without evaluating the entire circumstance. That's, I believe, what you would take from Sands. So although the end of the application here says truth or falsity, the pertinent question says, did you know? That's a subjective test. Okay. Now, moving away from rescission, isn't this a claims-made policy? It wasn't a claim made before the policy went into effect? No, Your Honor. Again, the pertinent case here is Scott v. Lloyds. That's a district court case. But in the trial court, they relied on cases such as Boardwalk and Dytek. And in those cases, the definition of a claim involved, does someone intend to hold you liable? Their policy is different. A claim is defined as a written demand for monetary or non-monetary relief. And this court in Clarendon, which is applied in the Scott case, said that that needs to require some immediate demand, some time limited or some, you need to pay this in 15 days. Our first position would be that these letters, their argument is that the e-mails in the beginning of 2017 were claims. I would submit that if you read those closely, none of those claims were made to Anchor. They begin with a request to revalue their THD stock by a sense of a seriousty. They end with a demand for rescission from THD, and then the Investors Council gets retained, files a lawsuit against THD. So I would submit that those, they were not claims involving Anchor, but let's say they were. None of those e-mails until the Investors, until the Investors demand letter would have been time limited to be, to qualify as a claim under any of these, any of this case law. And the Investors Council about that demand letter, again, said I was not accusing Anchor of anything. Okay, but it is a claims made policy. I believe it is. Okay, all right. Thank you, Counsel. You've reserved your time for rebuttal. Thank you. We'll hear from Mr. Bahadur. Great pronunciation. May it please the Court, Sina Bahadur and four underwriters. We know the Investors sued Anchor, Bowman, and Griffin. Why were Bowman and Griffin and Anchor sued? Here's what the Investors said in their complaint. Bowman had actual or apparent authority for THD, THD2, Tibbetts, and Anchor. Griffin had actual or apparent authority for THD, THD2, DCR, and Anchor. We also know that count one of that complaint was for what? Rescission. So there's a through line that runs through all of this. And we also know that there was a judgment entered against Anchor for its involvement, its agents, in soliciting investment. So here's my concern about this. There's no question there was a rescission claim against THD before entry of the policy. The question here, there are two questions. One is whether there was a rescission claim against Anchor before entry of the policy. And the other one is whether Anchor had reason to know that there might be a rescission claim against Anchor before entry of the policy. Right? That's fair to say? Yes. So my concern is that the email, there are a couple concerns. Let me just sort of list them out. The email communications are not specific with respect to who, against whom they're demanding rescission. And the investment is in THD, not specifically into Anchor. Even though, of course, the investors are expecting THD to invest the money they invest in THD, into Anchor. That's the first thing. The second thing is that when they actually go ahead and they file suit for rescission, they file suit against just THD. They don't file suit against Anchor. And, you know, so these kinds of things sort of might suggest, first of all, that there was no claim, there was no actual claim as a matter of truth and falsity against Anchor before entry of the insurance policy. And they may or may not suggest that Anchor didn't have reason to know that there was, that there could be a claim against Anchor before entry of the rescission, before entry of the insurance policy. So can you address those things for me, please? Yes, and as a point of precision, because during the initial colloquy with counsel, there's been a lot of talk about whether there was a claim or could be a claim against Anchor. But that's not actually just the focus of the inquiry. It's whether it could be against Anchor or any director, or any director. So it's not just about what a claim is. But they would have to be a director, they would have to be in their capacity as a director of Anchor, right? It's not enough if the claim was against a director in his or her capacity as a director of THD, but not against Anchor. Would you agree with that? Yes. So it's the same question, really. Maybe it's the same question. And the reason why I say that is there could be instances where they might choose not to pursue Anchor, but they would choose to pursue the Anchor management that were wearing multiple hats and acting both as Anchor management as well as acting as investors. And there is the direct, I guess, the direction of one of the emails to one of the directors as director of Anchor. Yes. And let's go back and think about this. So when the investors find out about the debt financing, they ask for an emergency meeting. We know that. And all of this, by the way, is laid out in two letters from the Investors Council. First, the April 16th letter from Council. And then there's a follow up in May that provides a full timeline. So they ask for an emergency meeting in January of 2018. In attendance is Anchor's CEO, CFO, and president, as well as Bowman and Monk. That's the first time the investors ask for rescission. But let me stop you. How does that show that Anchor knows that they're going to seek rescission or they might reasonably seek rescission from Anchor? So let's continue the timeline if I may. Okay. That's fine. But the reason I'm asking is because if you're relying on that as evidence that they knew or should have known at that point, I need to know what it is about that that would make us think they knew or should have known at that point. Or maybe what your point is is, well, maybe they didn't know and they shouldn't have known at that point. But there is additional stuff that happened when you consider all of it together. Is that what your point is? It started off with them trying to get together with people that they had done deals with in the past and try to work something out. And then it kept escalating all the way through the point when the investors hired Council. But Judge Wilson actually, I believe he touched on this email. This is an email that the investors sent amongst themselves in February. Because again, it's continuing to escalate. Yesterday had an emotional and heated call with the Anchor guys. I really feel that Dan, Chairman of Anchor and THD, knew or should have known that the financial information that was provided to us was not accurate. That's true. But how does that show that Anchor knew about that conversation? That in and of itself is not enough because it was an internal email. But it was describing a meeting. But there's obviously a whole lot more. Then we've got the email that's amongst Hooker, Bowman, Griffin and Monk. All of them are chairmen and directors of Anchor. As well as being parties that are involved with these SPEs. Hooker says to the group, I'm just over it. Let them sue us. And then in response to that email is when Bowman writes back. And it's an admission on his part. He recognizes he's at the center of everything that's going on because they can't claim ignorance over the debt financing that was going on at the time. Because he's the chairman of the board. He says, from what I understand, they want all their money back. Their reasons are our guy, Dan, as chairman, runs the company. So again, it's an acknowledgment on his part. But there's more. How does that show that Anchor knew as opposed to just THD? It shows that Bowman knows. And Bowman is the chairman of Anchor. But Bowman, isn't Bowman also on the board of directors? Right. So how do we know? I mean, this is the problem here, right? How do we know that he understood that they were going to come after Anchor instead of just after THD? Because there's just so much sharing of directors here. He did write, Your Honor, our guy, Dan, as chairman, runs the company. And if we look at Q9... I'm sorry. Just to be sure I understand. Dan did not also run THD? Yes, he did. He ran both. And that was the conflict of interest. But how do we know that they're talking about Anchor having a potential claim against Anchor as opposed to having a potential claim against THD? If I may, let's track the continued escalation here. So eventually the investors are fed up. Unless there's rescission is on the table, they're not willing to have any more meetings. So they go out and they hire counsel. Counsel sends a letter that's directed to Dan Bowman, chairman, Anchor board, CEO of Tibbetts, manager of THD LLC. He asked for rescission in that. Bowman was deposed. He admitted that the April 16th letter qualifies as a claim. But there's a second letter immediately after that where counsel for the investors elaborates on the timeline. And here's what counsel says in the second letter. Management was meeting with major investors, ESRIC, to solicit additional funds from them, yet never disclosed the debt financing that the company had also been seeking for months. Again, there's a theme that's starting to build. And if we look further from there. I apologize, but it's really helpful to me if you're precise in telling me how it relates to Anchor specifically as opposed to just THD. Because they invested in THD. They didn't invest in Anchor. Yes, they were using the investments in THDs for the purpose of being a vehicle to invest in Anchor. But you know what I'm saying? Yeah, I do. So in the second letter from counsel for the investors, he says management was meeting with major investors. When he's saying management, he's referring to Anchor management. And how do we know that? We have to connect some dots, but that's obviously possible here. So initially, when the investors were approached, Bowman, Griffin and Monk gave the investors a Anchor pitch deck. And it was a pitch deck that was approved by Bowman. Nowhere in that pitch deck was there any mention of a debt financing going on. After that, they haven't invested at the time. In the summer of 2017, there are two important meetings that happen. The investors go to Anchor's office. They meet with the CEO, CFO and president of Anchor. At no point during that in-person meeting is debt financing brought up. How do we know that's relevant? Because the investors' counsel references it in his second letter. Immediately after that meeting, they meet with Bowman, Griffin and Monk. During that meeting, once again, the debt financing never comes up. And that's really the heart of what the entire investor suit was about, was you can't claim ignorance, Bowman, Monk and Griffin, about the debt financing because you're actually running the company. You have multiple hats that you're wearing. I was going to ask, what does Beck v. Deloitte and Tooch say? Our 11th Circuit case in 1998 that the district court relied upon to conclude that Bowman's knowledge and the other directors, the consistent directors for both organizations, their knowledge is imputable to Anchor. And so what does their case say? Because that's the case that the district court relies upon in order to find that the knowledge of the directors is imputable to Anchor. I have three answers to that question, if I may. The first is you don't have to impute knowledge here. All we have to do is look at the questions in the application. Question 10 says, does the applicant or any director know of any act, error or omission? So the applicant has an obligation to make sure that whatever it's marking is consistent with the knowledge of its directors. So there's no imputation that needs to happen there. Bowman's by marking no, they were marking that every director also had no knowledge of any act, error or omission that could give rise to a claim. Two, Your Honor, in counsel's brief on page 34, they conceded that Bowman and Griffin's, I'm sorry, Bowman's knowledge in particular could be imputed to Anchor. And three, we believe that that case stands for that proposition that a legal fiction being a company can't claim ignorance because it can only act through the individuals, which are its directors and officers. And why isn't that piercing the veil? Piercing the veil is a liability concept. What we're talking about here is an application for insurance where you are being asked for candor in terms of claims information and it requires you to answer on your own behalf and also to comment on the knowledge of your officers. So I believe that piercing the corporate veil is an ill fit for an insurance application. The one other thing that I wanted to touch on. With the time that you have left, can you tell us whether or not the claim is excluded under paragraph 4C since it's a claims-made policy? It is, Your Honor. And actually, I would ask the court to look at the briefing on summary judgment because the treatment on the claims-made argument was literally two sentences.  So while counsel has done its best on appeal and trial and repair, we're obviously limited to that. But yes, I want to ask you to look at three pieces of information for the claims made. At least three. You have the April 16th letter from the Investors' Counsel to Dan Bowman, which Bowman testified is a claim. You have the follow-up letter on May 18 of 2018. And then there's a third piece of evidence, which is the October 25th subpoena. The district court actually, that's one place where he got it wrong. We probably didn't do a good enough job highlighting it for him. The timeline is through November 30, 2018 because under the terms of the application, you have a duty to supplement. So it's not just when you sign the application that you're done. You have a duty to supplement all the way through the inception of the policy, which was on November 30, 2018. And on October 25, 2018, in the middle of this investor suit, over $11.7 million, you got a subpoena that goes to Anchor. So that is also evidence. And then one final piece that I haven't touched on, and this is also before the inception of the policy. In the investor suit, on November 7, 2018, Stephen Essrich, the principal investor, was deposed. Who decides he's going to personally attend Essrich's deposition? Dan Bowman. What do we know that Bowman heard for himself Essrich describe Dan Bowman's involvement? There was also the senior management team of Anchor that provided numbers and information that I think had a responsibility as well. So Anchor had a responsibility to tell us. The board of directors had a responsibility to tell us. Mr. Bowman was very involved. He's the chairman of Anchor. So, again, this was... So are you arguing that we could decide the case based on paragraph 4C without regard to rescission? That's right, Your Honor. Even though the district court didn't say? Absolutely. That's an alternative grounds. It was fully briefed on summary judgment. That's right. Okay. So there's sufficient evidence in this record for us to determine that the claims arose prior to the date that the policy went into effect? That's correct, Your Honor. Okay. And that would be the cleanest way to resolve this case. I think it's all so compelling, and Judge Avedu actually touched on this. Most of the rescission cases involve some ill individual who's going in there, filling out a life insurance policy or a health insurance policy. The irony here is Anchor is an insurance company. It should know better, and it should appreciate how important candor in the application process is. So whether it's on just the issue of rescission or whether it's also on the grounds of claims made, we believe that the court should affirm. All right. Thank you. And Mr. Chitnis, you've reserved some time for rebuttal. Thank you, Your Honor. I don't know if the court would prefer that I start somewhere particular. I'll begin sort of at the end. I'll refer the court to the case law cited in the briefing. The claim is the definition of a claim in this case is far narrower than the definition in the case law that lawyers are liable, which involved someone intends to hold you liable. This court's precedent in Clarendon is fairly clear. There's no time demand in any of those emails leading to the Investors' Counsel's first demand letter. That author testified under oath that he made no accusations against Anker. So those claims are not claims against Anker. Basically, the testimony in question wrote that demand letter. I would go to, at the beginning of the argument, Judge Rosenbaum asked about the emails being somewhat specific or inspecific. They are actually sort of specific because none of them are addressed to an Anker account. There is no email to a- But one of them is addressed to somebody in his capacity as Anker, right? The first demand letter, the April 6, 2018, in the addressee is Mr. Bowman, Director of Anker. That is correct. But again, that author, and I would also look to the memo line in that. It's THD, THD2 line, Investors. There's no mention of Anker. There's no request from Anker. And that author, again, testified. I was not making an accusation against Anker. Otherwise, no, there's nowhere that says, you know, you as director, here is an email. And if you look at them closely, what they were trying to do was initially to change their cost basis. Again, they wanted issuance of additional Series C stock. That made a decision from THD, and then they hired a lawyer. That sequence of events really goes to the point that these questions about connecting the dots, about these meetings, who, what, and when, these are questions ill-suited for summary judgment. So I'm looking at the district court summary judgment, page five of the summary judgment. And the judge says the record is clear that prior to October 16, 2018, when it submitted its application to plaintiff, Anker had actual knowledge of the potential claims against it by the investors, including a claim for rescission on March 14, 2018. Bowman, the chair, acknowledged to Munch and Hooker, directors, that the investors wanted their money back. Moreover, on April 6, 2018, counsel for the investors sent a demand letter addressed to Bowman as the chair of Anker. Bowman himself has even acknowledged that he did not believe the investors were going to walk away from their $11.7 million investment and not sue Anker. And so if we accept your argument, we'd have to find that those findings of fact by the district court are clearly erroneous. Your Honor, I think the – we address those extensively, each one of those pieces of evidence, because that's the only thing the district court cited. Yeah, we'd have to find that they're clearly erroneous in order to accept your argument. I believe the court can just determine that there is a dispute of fact that the district court did not address. And our primary argument is the way the district court got around that, around the fact that there are other facts and circumstances, was, as I noted at pages 5 to 6 of the opinion, to say no reasonable jury could determine that these potential claims against THD were not also potential claims against Anker. That, to me, is the short circuit. I don't know that the findings are necessarily – a jury could make those findings, but the jury would need to consider the rest of the evidence. And that's the mistake, that's the error in this, is that what they knew is subject to the entirety of the circumstances. I'd refer the court again. I didn't want to eat into my extra time in the beginning, but the Casa Messina case, which involves someone who went to use a summary MRI. The question says, have you ever had diagnostic testing? He was ordered to use an MRI, but there was an additional fact. He told his doctor later, I think my symptoms have resolved. He says no to the application. It's an incorrect answer. But the court said the summary judgment was improper because the jury needed to consider all of the facts. And we would submit that considering all the facts in this case, a reasonable jury could find that these are separate entities because they were. And claims against THD were not claims against Anker. All right. I think we have your argument. Thank you, counsel. The court is in recess until 9 o'clock tomorrow morning.